Marks. Mr. Marks. May it please the Court, this is indeed a similar case with the same specification, somewhat different claim structure, and the interesting thing about this case is the examiner's reliance on Siegel as prior art. And would you also concentrate on the differences between these cases? Yes, Your Honor. The principal difference that I'd like to start with is the examiner's reliance on different prior art and on Siegel. But they also are necessarily different inventions since they're in separate specifications? Yes. Well, the specifications are the same, the claims are somewhat different, so there are slightly different claims, and one would have to go through them word by word to see the differences. But we know that one is not entitled to more than one patent on the same invention, so they necessarily require distinction. Yes, ma'am. For example, let me refer to Claim 43, which talks about certification by self-certification or certification by a service provider or a service provider. You will see that there the claim was certification by self-certification and certification by the source and certification by the service provider. So there is a slight difference in the claims, but that's an important difference and that's how the claims are structured. So that's an example of the subtle differences in the language. And the patent office, I believe, the examiner understood that there was different claim language in both cases, so there is no double patent issue. Was it the same examiner? Yes. What we're dealing with in both these cases, and it's important to understand this, is the same examiner and the same supervisor, and the board considered the two cases together. So the examiner in both cases was the same. She had all the references from one case through information disclosure statements when the other case was before her. So what distinguishes Claim 1 in each patent from the other? You should have that on the top of your head. What distinguishes the two? Your Honor, I've got Claim 1, both of them right in front of me. It's in the first sub-paragraph. In 1581, it's a collection of patient-based electronic medical records containing medical information of a plurality of persons, and in the earlier case, it's a collection of patient-based electronic medical records of a plurality of persons, at least one of which is encrypted or secured when collected, assessed, inputted, vetted, integrated, or transmitted wherein, and that's the difference in those two claims. Yeah, but it sounds to me like the Claim 1 in the first patent could be a dependent claim from the second patent. They're both talking about just what's different, not what is additional. That's a dependent claim. What's different? Your Honor, I can only point to the language that I've just recited and say that the fact we were dealing with encrypted or otherwise secured information is sufficiently different to warrant a different claim, at least in our estimation. Do these claims... How do you get around Siegel? Your Honor, Siegel is based on a notion that is not part of our invention. Siegel claims that computerized records are inherently more accurate than paper-based records, and inherent accuracy is nothing that we claim. In fact, we believe it's obviously wrong, and what the examiner has done in Siegel and what the board allowed the examiner to do is to say that this notion... Siegel certifies something is accurate, right? No, it does not, Your Honor. Siegel says that because something is put, that because information is put into a computerized form, then it is inherently more accurate than the paper-based medium in which it was originally found. The image server, quote, performs quality assurance checks on the images to verify diagnostic quality. Yes, it performs... Isn't that certifying? I believe so, Your Honor, because our certification is an additional step, and then the guarantee or warranty of non-repudiation is a further additional step. Moreover, when the check is made of diagnostic quality in Siegel, that's not a check of the information in the image. It's simply a check that the information, that the image rather, is stored in the way that the system is supposed to store it. And while that may seem to be a subtle difference, it's really important because what the check accomplishes in Siegel is to make sure that the machine functioned properly. It doesn't say anything about the information in the image. So Siegel's notion of inherent accuracy is something that the examiner picked up and said, well, Knauss is looking to create an accurate record, and therefore there's no difference between what Siegel has done and what Knauss has done. In fact, if you look at the secondary considerations that are required as part of the grand KSR functional test, you notice none of the verification, certification, and non-repudiation features of the Knauss invention because Siegel relies for the accuracy of the information in the record on this notion that simply inputting information into a computer database makes it more accurate. Not our invention as well as being not true. In fact, the whole point of our invention is that when information is put into medical record systems, be they paper or computer, in fact errors pop up all the time. A man's PSA test can wind up in a woman's file. Pap smear test can wind up in a man's file or in the file of some other wrong patient. And these errors, in fact, are well known in the medical record art and they're prolific. So the kinds of checks and then the certification separate step, a distinct discrete step, and then the creation of the attribute of non-repudiation which requires the system operator to give a warranty or a guarantee, another discrete separate step, is the kind of thing that solves this long persistent problem that Dr. Sinborg and the other people have identified as being an issue. And nothing in Siegel solves that problem. And when you look at what the examiner did, there's actually one point where the examiner wants to combine the Ertl reference with Siegel and she actually says, we realize that Siegel doesn't doesn't solve this problem. Of course Ertl involves hospital claims data, insurance claims data, it's a hospital-based system and for the same reason that in the earlier case Shepard couldn't be, is not properly combinable with Snowden, Ertl is not properly combinable with Siegel. So the whole analysis in 1581 rests on this false premise of inherent accuracy. And let me stress again, our case here, the invention that we are talking about in the Knauss patents, is not inherent accuracy. It is, its objective reach is to create a reliable record that's in the patient's hands that can be in fact the primary record, that is the record that any doctor can use to treat that patient is the custodian, has control, dominion, ownership of that record. Nothing in the institutional record systems that we see anywhere in the United States have those features. And if they did, we'd be dealing with a wholly different world. These functions are extraordinarily important and essentially what the examiner did was to, not to read the claims in either case in the context of the specification, but to read those claims in the kind of A plus B plus C analysis that this court condemned in the Ruiz v. A. B. Chan's case. All right. Let's save you a little time, Mr. Larkin. Let's hear from the office. Your Honors, Mr. Court, I want to get directly to some of your questions about Siegel and Judge Reiter's question about the difference between claim one in the two cases. In addition to the encryption, claim one in this case does not require certification. Other claims require certification, but claim one does not. Knauss' counsel relies on the inherent accuracy of Siegel and he keeps saying that the inherent accuracy of Siegel isn't enough to satisfy certification or non-repudiation. But as both the examiner and the board made clear, they didn't rely on just the inherent accuracy language in Siegel, which is in paragraph eight. They also relied on paragraph 131, which is at A-689 of Siegel. And in particular, the last server provides quality assurance checks on the images to verify diagnostic quality. Is that just making sure they're not blurry? That they're not blurry? Blurry. It's to make sure that they're of sufficient diagnostic quality that they're usable. One of the things that the Siegel patent talks about is having a radiologist off-site and trying to send them images. And so when the radiologist gets this in this preferred embodiment, they know that a sufficient check has been done, that they're getting something of sufficient quality that they can read it and use it. Otherwise, if they're getting a mammography, which is what this is referring to, and they can't read it, it's not doing them any good. And so what the board said at A-13, the last sentence, is a computerized record, which has undergone a quality insurance, not only has the inherent accuracy of its nature, but Siegel further discloses that the record is affirmatively checked for quality, e.g. accuracy. Do the claims require both accuracy and correctness? And what's the distinction? I can see accuracy meaning the record is exactly as it was created, therefore accurate. If it's correct, that means it accurately reflects the patient's condition as well. So you're going to do a double check on whether I actually have lung cancer? Your Honor, I don't think the specification makes clear what the difference between accuracy and correctness is. I don't think it does either, but it uses both terms. What does it mean? Well, let's go to each one, because certification just says that the record is correct in all material respects or it's internally consistent. And then non-repudiation says accuracy and correctness. Accuracy could be that it is what, well, correct, I guess, is that if you go back to certification, it's correct in that it is what was sent to you, and accurate means that it accurately reflects what the patient's condition is, is the way I would read it. In which case, there'd be no difference between them? There would be a difference between them, because the non-repudiation requires that it's good or better than exists at the source sites. And certification just says it's correct in all material respects. Correctly reported. Doesn't go to the correctness of the diagnosis? Right. Correct, Your Honor. The other argument that Nelson's counsel makes is that the check on the imaging is not a check on the medical information itself. And we disagree with that, because the image, the diagnostic image that the radiologist is trying to read is the medical information itself. And finally, I'll say that ERTL, like Snowden and Shepard, even though it's institution-based, there's every reason to combine the two references, because if a person is looking for accurate and correct records, there's no reason to think that a person who wanted to accurately look to devices and methods that they've used in institution-based. So if Your Honors have no further questions, I will make my move. Do you have any questions for Ms. Lynch? Do you have any questions? Thank you, Ms. Lynch. Mr. Marks, you have a little time left if you need it. Thank you, Your Honor. Let me start by pointing out that both these cases are continuations of each other. So although they are, there are some differences. No, that's not possible, is it? They can only have the later can be a continuation of the earlier, but it can't be vice versa. I don't believe it's so identified in the specification. Was the intention to add that designation? I think it is somewhere in the record, Your Honor, but I can't. Well, we'll accept that that's how it would be processed. I want to go back to this basic notion that accuracy is not non-repudiation. Accuracy is not certification, and accuracy is not even vetting. Those are distinct steps. They're so identified in the specification. That's the word you use, verified as accurate. Verified as accurate, that's right, but accuracy does not mean non-repudiation, Your Honor. And inherent accuracy is not the same as going through a series of steps, and I point out figure eight as an embodiment, to verify the data. And the point of all of this, it's true in this case as it was in the earlier case that we dealt with, 1482, that the steps used to create a verified, a vetted, certified, non-repudiated record, a series of distinct steps, are very different from the inherent accuracy that's claimed in Siegel. And the addition of ERTL doesn't help because patients are not trying to file insurance claims for hospitals or doctors. The whole point of ERTL is that it's an institutional-based system, a very complicated one, to help hospitals make sure that the insurance claims they file for procedures that they've performed are correct in all respects. They just don't work in a record that a patient has control over. There, we've come to this fundamental definitional distinction between the regime of institutionally-controlled records, where you have all these institutional quality controls, and a patient-controlled record, where the Knauss invention becomes new, and in fact sets a new threshold. I believe my time is up. Okay. Any questions? Any more questions? Thank you, Mr. Marks, Ms. Lynch, Mr. Lamarck. The case is taken under submission.